Filed 9/4/14  In re Wyatt V. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re WYATT V., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, | F067743 |
| Plaintiff and Respondent, | (Super. Ct. No. JJD065772) |
| v. | |
| WYATT V., | **OPINION** |
| Defendant and Appellant. | |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Tulare County.  Juliet L. Boccone, Judge.

Arthur L. Bowie, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and John W. Powell, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Cornell, Acting P.J., Gomes, J. and Kane, J.

**INTRODUCTION**

It was found true that appellant Wyatt V. had attempted willfully and deliberately to commit murder, conspiracy to commit murder, kidnapping to commit robbery, and criminal threats. Wyatt contends the juvenile court failed to exercise its discretion properly when he was committed to the Department of Corrections and Rehabilitation, Division of Juvenile Facilities (DJF), for a maximum period of 40 years to life for these offenses. We disagree and will affirm the commitment order.

**FACTUAL AND PROCEDURAL SUMMARY**

In April 2013 Wyatt was a ward of the juvenile court. A Welfare and Institutions Code section 602[1] petition was filed against him in 2011 alleging multiple counts, including first degree burglary, vandalism, second degree burglary, and misdemeanor attempted petty theft. Wyatt admitted some of the counts and several of the others were found true by the juvenile court. As a result, Wyatt was declared a ward of the court, placed on probation, and placed in the physical custody of his father.

In October 2012 a probation violation was alleged, which Wyatt admitted. In November 2012 the juvenile court continued Wyatt as a ward, again placing him in the custody of his father and under the supervision of the probation officer.

On April 4, 2013, Amy K. was working as a pizza delivery person. Around 4:00 p.m. that day she received an order for a pizza delivery. When she arrived, Ronald J. answered the door and told her to bring the pizza around to the back. Once in the back, Pete S. appeared and pointed a rifle at Amy. Pete told Amy to "drop everything" and to "get down," and she complied. At this point, Wyatt came outside and Pete handed the rifle to Wyatt.

---

[1]All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

Amy's wrists, arms, and feet were bound and she was blindfolded. She could hear the boys talking about the bag of money she had dropped. Even though blindfolded, Amy could see Pete, who told her he and the others made money by going after delivery drivers. Wyatt, Pete, Ronald, and a fourth juvenile, Logan H., discussed what to do with Amy. At one point Logan tried to break Amy's neck by grabbing her neck and twisting it.

Logan indicated Amy had to die. Wyatt stated that one of the guys "wants a go at her" and that they were going to rape Amy with a knife. Logan and Wyatt proceeded to discuss various ways to kill Amy. At some point they took the keys to Amy's car from the pocket of her pants. Amy could hear the sounds of the boys loading items into the car.

Amy was told they had to kill her to prevent her from telling the police and testifying against them. Logan told Wyatt to "[t]ake care" of Amy. Wyatt asked Amy if she wanted "a machete to the heart" or instead have him "break [her] neck." Amy asked for "something not painful," like "pills for [an] overdose." Wyatt agreed and fed Amy 12 pills. Afterwards, Wyatt stated, "I knew we should have fucking slit her throat" and walked out of the house.

As soon as Amy heard the juveniles drive away in her car, she untied herself and then tried to vomit up the pills she had swallowed. Amy then ran next door to call the police.

Wyatt and the other three juveniles eventually were apprehended in Nevada. Wyatt was interviewed at a juvenile detention facility in Las Vegas on April 5, 2012. Wyatt admitted he had committed a burglary with Logan, Ronald, and Pete. The juveniles had planned to leave California to avoid being arrested and decided to rob a pizza delivery driver to obtain cash and a vehicle.

During the interview, Wyatt also admitted that the group of boys had planned to kill Amy. When he was interviewed, Ronald said he gave a bottle of pills to Wyatt and that Wyatt made Amy swallow all the pills. Ronald stated, "she should be dead by now."

In his interview, Logan admitted all four boys had been involved in a burglary and they eventually decided to rob and kill a pizza delivery driver. He also acknowledged trying to break Amy's neck. He claimed Wyatt and Pete were the leaders of the group.

On April 15, 2013, a section 602 petition was filed alleging Wyatt committed willful, deliberate, and premeditated attempted murder, kidnapping to commit robbery, second degree robbery, criminal threats, unlawful driving or taking of a vehicle, and conspiracy to commit murder. Wyatt denied each of the allegations in the petition. At the contested jurisdictional hearing, the juvenile court found all six counts to be true beyond a reasonable doubt.

The dispositional hearing was held on August 1, 2013. The juvenile court continued Wyatt as a ward of the court, removed him from the custody of his father, and committed him to DJF for the maximum term of 40 years to life, with the possibility of parole for the offenses sustained in the 2013 petition. A commitment term of 12 years 6 months was ordered for the offenses sustained in the 2012 petition.

## DISCUSSION

Wyatt's sole contention on appeal is that the juvenile court failed to "expressly exercise statutory discretion" when it committed him to DJF for the maximum term of confinement and, consequently, the matter must be remanded. We disagree.

As an appellate court, we review a commitment decision for abuse of discretion, indulging all reasonable inferences to support the juvenile court's decision. (*In re Angela M.* (2003) 111 Cal.App.4th 1392, 1396.) "[T]here must be evidence in the record demonstrating both a probable benefit to the minor by a [DJF] commitment and the inappropriateness or ineffectiveness of less restrictive alternatives." (*Ibid.*) While the juvenile court law contemplates a progressively restrictive series of dispositions, there is

4.

no absolute rule that the court may not impose a particular commitment until less restrictive placements actually have been attempted. (*In re Eddie M.* (2003) 31 Cal.4th 480, 507, citing Welf. & Inst. Code, § 202.) Moreover, while DJF generally is a treatment of last resort, the circumstances in a particular case may well suggest the need for a DJF commitment, despite the availability of lesser alternative dispositions. (*In re Tyrone O.* (1989) 209 Cal.App.3d 145, 151.) A juvenile's commitment will not be overturned unless it exceeds the bounds of reason. (*In re Travis W.* (2003) 107 Cal.App.4th 368, 379-380.)

Here, there was an exercise of discretion by the juvenile court and no abuse of that discretion. At the dispositional hearing, the juvenile court reviewed Wyatt's lengthy juvenile record and his history of violating terms of probation. The juvenile court noted that after he was declared a ward of the court in October 2011 and placed in his father's custody, Wyatt frequently was truant from school, was found to be under the influence of alcohol, despite efforts of the juvenile court to have Wyatt participate in treatment programs, continued to participate in criminal activity, and committed his most recent offenses while on probation. The juvenile court also noted Wyatt's tendency to lie about or minimize his involvement in criminal activity.

The juvenile court noted that local programs, including custodial programs and probation, had been tried in the past with Wyatt, without success. The juvenile court opined that Wyatt had refused to address his alcohol abuse and controlled substance issues, was not taking full responsibility for his actions, and the current offenses were "very serious" and potentially "life ending." In selecting an appropriate commitment, the juvenile court stated it was concerned about what was best for Wyatt as well as the community.

After articulating this reasoning, the juvenile court ordered Wyatt committed to DJF and fixed the maximum term of commitment.

5.

When a juvenile is removed from the physical custody of a parent, as Wyatt was here, the juvenile court must specify the maximum term of confinement that can be imposed. (§ 726, subd. (d); *In re Jovan B.* (1993) 6 Cal.4th 801, 818.) Once a juvenile is committed to DJF, a discretionary determination as to the maximum term of confinement must be made by the juvenile court, based upon the facts and circumstances that brought the minor before the juvenile court. (*In re Carlos E.* (2005) 127 Cal.App.4th 1529, 1533.) The maximum period of confinement cannot exceed the maximum period prescribed by adult sentencing law. (*Ibid.*)

Wyatt seems to believe the juvenile court has to use specific language and expressly utter a phrase or phrases that it is considering all the facts and circumstances and is aware of its discretion in setting a term of commitment. There is nothing in the record to indicate the juvenile court was unaware of its discretion to impose a term of commitment less than the maximum. A silent record, which is at best what Wyatt relies upon, is not sufficient to rebut the presumption that the juvenile court was aware of its discretion to impose less than the maximum term of confinement. (*In re Julian R.* (2009) 47 Cal.4th 487, 499 (*Julian R.*).)

The probation report before the juvenile court listed no mitigating factors and 10 aggravating factors for the most recent offenses. The current offenses involved a sophisticated plan and terrorizing the victim, who suffered from posttraumatic stress disorder as a result, which impacted her ability to care for her autistic son.

The juvenile court noted Wyatt's lengthy history of offenses and the increasing seriousness. Additionally, the juvenile court noted that Wyatt needed a long commitment period because attempts to resolve his delinquency issues in shorter periods of time had been unsuccessful, and that Wyatt had to cooperate in his rehabilitation. If not, Wyatt's behavior could warrant "commitment to a life-long program." A lengthy term of confinement is recognized as a rehabilitative tool in juvenile cases. (*In re Luisa Z.* (2000) 78 Cal.App.4th 978, 987-988.)

6.

The juvenile court's lengthy explanation of how it arrived at the terms of commitment clearly demonstrates the juvenile court weighed all the facts and circumstances and balanced those facts and circumstances against what was best for Wyatt's rehabilitation and the protection of the community in setting a term of commitment. The silent record and speculation relied upon by Wyatt to assert the juvenile court was unaware of its discretion simply does not establish affirmatively that the juvenile court was unaware of, and failed to exercise, its discretion. (*Julian R., supra,* 147 Cal.4th at p. 499.)

**DISPOSITION**

The commitment order is affirmed.

7.